TRUMANE CALVERT,

      Plaintiff,

  v.                                  **Case No. 2:19-cv-16**
                                                   **JUDGE GEORGE C. SMITH**
                                                   **Magistrate Judge Vascura**

CITY OF STEUBENVILLE, *et al.*,

      Defendants.

## OPINION AND ORDER

Currently pending before the Court is Defendants City of Steubenville, William A. McCafferty ("Chief McCafferty"), Officer R. Cook ("Officer Cook"), Officer L. Powell ("Officer Powell"), Officer L. Bickerstaff ("Officer Bickerstaff"), and Officer T. Crawford's ("Officer Crawford") (collectively, "Defendants") Motion for Summary Judgment. (Doc. 52). Plaintiff responded. (Doc. 57). Defendants replied. (Doc. 59). Accordingly, this matter is ripe for disposition. For the reasons that follow, Defendants' Motion for Summary Judgment is **GRANTED**.

## I.      BACKGROUND

Plaintiff Trumane Calvert ("Plaintiff" or "Mr. Calvert") commenced this action on January 3, 2019, with the filing of a three-count Complaint, alleging: 1) excessive force under 42 U.S.C. § 1983; 2) assault and battery; and 3) a claim pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). (*See* Doc. 1, Compl. ¶¶ 57–73).

## A. Factual Background

On January 9, 2018, Plaintiff was checked into Trinity West Hospital[1] ("Trinity") in Steubenville, Ohio to receive mental health treatment. Plaintiff remained at Trinity on January 10, 2018, and he slept for the majority of the day. When Plaintiff awoke during the evening of January 10, 2018, he was irritable and fought with both hospital staff and the hospital security guards. After fighting with hospital staff and security, Plaintiff left Trinity. (*See* Doc. 53-1, Medical Records).[2]

Hospital staff then called the police. (*See* Doc. 53-2, Police Report at 1). Officer Cook was the first to respond to the call; Officer Powell responded to the call shortly after Officer Cook. In his report, Officer Cook stated:

> I responded to Trinity West in regards to a call of a belligerent patient fighting with security guards. Upon arrival, I was met outside by a nurse and security. The nurse asked me if I got him and I asked, "Got who?" as the last information I received was a male in the hospital fighting with security.
>
> The nurse advised me the male involved was a black male wearing a white tank top, boxer shorts and socks. She advised [me] the male had fought security and was, "On a hold", which I interpreted as a police hold. She stated the male fled the area and was last seen on Johnson Rd.

(*Id.* at 5). Officer Cook's police report is consistent with the information he attested to in his sworn declaration as well as the video footage from his cruiser's dashcam. (*See* Doc. 53-5, Cook Dec. ¶¶ 3–4; Ex. D, Cook Dashcam at 18:52:46–18:53:38).[3] Officer Powell stated:

> Units responded to Trinity West in regards to a male subject that had left the Emergency Room and reportedly fought with several security guards prior to his departure. Sgt. Cook arrived on scene just prior to me, and advised that the male subject was a black male and was only wearing boxer shorts and socks and was on

---

[1] The Court notes that, in their Memorandum in Support of the Motion for Summary Judgment, Defendants refer to Trinity as "Trinity East Hospital." (*See* Doc. 53, Memo in Supp. of MSJ at 4). Record evidence filed in support of the Motion for Summary Judgment, however, refers to Trinity as Trinity West Hospital. (*See* Doc. 53-1, Pl. Medical Records; 53-2 Doc. 53-5, Cook Dec.).

[2] To protect Mr. Calvert's privacy, Docket Entry 53-1 has been filed with the Court under seal.

[3] The dashcam footage is timestamped in the upper righthand corner of the video; the Court's citations to the dashcam footage will reflect the timestamp.

a hold. Trinity gave limited information on the subject, and could not immediately provide a name, and only advised that the subject was on a "hold". Hospital staff never specified if the man was on a hospital hold, or a police hold.

(Doc. 53-2, Police Report at 3; *see also* Doc. 53-4, Powell Dec. ¶¶ 3–4).

As hospital staff failed to specify the type of hold that the patient was on, Officer Cook interpreted the hold to be a police hold, which means that the patient "had been arrested for a criminal offense, was receiving medical treatment, and was not permitted to leave the hospital." (Doc. 53-5, Cook Dec. ¶¶ 4–5). Officer Cook then radioed the new information about the Plaintiff to other officers. (*See* Doc. 53-2, Police Report at 5). Officers Cook and Powell departed Trinity shortly after to begin searching for Plaintiff. (*Id.* at 2, 5).

As Officer Cook returned to his vehicle, he received radio correspondence from Officer Bickerstaff stating that he encountered Mr. Calvert—who was wearing a tank top and boxer shorts—walking along Johnson Road. (*See id.*at 4, 5; *see also* Ex. C, Bickerstaff Dashcam at 18:54:42; Doc. 53-6, Bickerstaff Dec. ¶ 4). Officer Bickerstaff, driving his marked police cruiser with his emergency lights turned on, pulled behind Mr. Calvert. (Doc. 53-2, Police Report at 4; Doc. 53-6, Bickerstaff Dec. ¶ 5). Mr. Calvert first turned to look at Officer Bickerstaff and then continued to walk away. (Doc. 53-6, Bickerstaff Dec. ¶ 6; Doc. 53-2, Police Report at 4; Ex. C, Bickerstaff Dashcam at 18:54:50–18:54:52). Officer Bickerstaff "yelled for [Plaintiff] to stop and come talk to me[,]" but Mr. Calvert "turned and continued to walk backwards and stated "You are going to have to shoot me." (Doc. 53-2, Police Report at 4; Doc. 53-6, Bickerstaff Dec. ¶¶ 7–8). Mr. Calvert told Officer Bickerstaff "several times" that the police were "going to have to shoot [him]." (Doc. 53-2, Police Report at 4; Doc. 53-6, Bickerstaff Dec. ¶ 8). Officer Bickerstaff followed Mr. Calvert as he was walking away, and "radioed along his location, and informed the officers listening to the radio that the suspect was not complying requests to stop." (Doc. 53-6,

Bickerstaff Dec. ¶ 9; *see also* Doc. 53-2, Police Report at 4). Officer Bickerstaff ordered Mr. Calvert to stop many times, Mr. Calvert failed to comply. (Doc. 53-6, Bickerstaff Dec. ¶ 10).

Having heard Officer Bickerstaff on the police radio, Officer Powell proceeded to Johnson Road; when he arrived at the scene, Mr. Calvert began to run across the street. (Doc. 53-6, Bickerstaff Dec. ¶ 11–12; Doc. 53-4, Powell Dec. ¶¶ 5–7). Officer Powell approached Plaintiff and "witnessed the [Plaintiff] ignore several commands from Sgt. Bickerstaff to get on the ground." (Doc. 53-4, Powell Dec. ¶ 8). Officer Powell then heard Plaintiff state "Just shoot me" several times as Plaintiff continued to ignore police commands to stop. (*Id.*).

Officer Cook arrived at the scene as Plaintiff was running from police and towards "Heritage Village apartments[,] which is an elderly residential living facility." (Doc. 53-5, Cook Dec. ¶ 8). Officer Cook then parked his cruiser and exited with police canine Bono ("Bono"). (*Id.* ¶ 9). Officer Cook approached Plaintiff with Bono and commanded Plaintiff to stop; Plaintiff failed to comply. (*Id.* ¶ 10; *see also* Doc. 53-4, Powell Dec. ¶ 9; Doc. 53-6, Bickerstaff Dec. ¶ 13; Ex. D, Cook Dashcam at 18:55:37–18:55:51).[4] Officer Cook then again commanded Plaintiff to stop; and, for the first time, Officer Cook warned Plaintiff that his failure to comply would result in the deployment of Bono. (Doc. 53-5, Cook Dec. ¶ 10; Ex. D, Cook Dashcam at 18:55:52–18:55:54). Plaintiff again ignored Officer Cook's command. (Doc. 53-5, Cook Dec. ¶ 10). Officer Cook again commanded Plaintiff twice "to stop or I'm gonna send the dog." (Ex. D, Cook Dashcam at 18:55:53–18:55:56). Plaintiff again failed to comply with Officer Cook's commands; instead Plaintiff turned towards Officer Cook, "bladed his body and raised his fists in a fighting stance and told [Officer Cook] to go ahead and send the dog as he was ready." (*Id.* ¶¶ 11–12; *see*

---

[4] For the majority of Officer Cook's time at the scene, including Officer Cook's interactions with Plaintiff, Plaintiff and Officer Cook are outside of the visual field of Officer Cook's dashcam footage. (*See* Ex. D, Cook Dashcam at 18:55:53–18:57:58). Audio from Plaintiff's encounter with police, however, was recorded. (*See generally id.*).

*also* Doc. 53-4, Powell Dec. ¶¶ 10–12;[5] Doc. 53-6, Bickerstaff Dec. ¶¶ 13–15).[6]  Again, Officer

Cook commanded Plaintiff to submit and warned Plaintiff that his failure to comply would result

in Bono's deployment; and again, Plaintiff failed to heed Officer Cook's warning.  (Doc. 53-5,

Cook Dec. ¶¶ 13–14).  Based on the foregoing interactions, Officer Cook states:

> I determined the [Plaintiff] was not going to comply with officers without there
> being a physical altercation.  I concluded the suspect was a danger to himself and
> others due to his statement that police would have to shoot him.  I concluded any
> physical altercation would likely lead to a struggle for an officer's weapon.  Due to
> these facts, the suspect's highly aggressive and agitated body language and tone of
> voice, and his chosen escape path leading directly toward a residential facility for
> the elderly, I determined the safest means to control the situation was to apprehend
> the suspect using K-9 Bono.

(*Id.* ¶ 15).

Officer Cook then gave Bono the command signal.  (*Id.* ¶ 16; Doc. 53-4, Powell Dec. ¶ 13;

Doc. 53-6, Bickerstaff Dec. ¶ 16).  Bono "engaged the [Plaintiff] by taking him to the ground by

targeting the bicep/triceps area of the left arm."  (Doc. 53-5, Cook Dec. ¶ 16; *see also* Doc. 53-4,

Powell Dec. ¶ 14; Doc. 53-6, Bickerstaff Dec. ¶ 17).  When Bono gained control of Plaintiff,

Officer Cook "approached and took control of K-9 Bono's collar[,]" Officer Cook then told the

"other officers to now take control of the [Plaintiff's] right arm."  (Doc. 53-5, Cook Dec. ¶ 16).

Officers Powell and Bickerstaff then handcuffed Plaintiff's right hand.  (Doc. 53-4, Powell Dec.

¶ 15; Doc. 53-6, Bickerstaff Dec. ¶ 18).  When the other officers had Plaintiff's free hand

handcuffed, Officer Cook commanded Bono to release and Bono "immediately released his grip

from the [Plaintiff's] arm."  (Doc. 53-5, Cook Dec. ¶ 16; Doc. 53-4, Powell Dec. ¶ 15; Doc. 53-6,

---

[5] Officer Powell states that, instead of complying with police commands to submit, Plaintiff "screamed several times to, 'Let the fucking dog go' and 'release that dog, go ahead' as the [Plaintiff] continued to move towards Sgt. Cook." (Doc. 53-4, Powell Dec. ¶ 12).
[6] Officer Bickerstaff states that Officer Cook ordered Plaintiff to submit and Plaintiff failed to do so, instead plaintiff "stopped, turned towards Sgt. Cook and took a fighting stance.  The [Plaintiff] then yelled, "Let the fucking dog go!" (Doc. 53-6, Bickerstaff Dec. ¶ 14).

Bickerstaff Dec. ¶ 18). Once Bono released Plaintiff, Officer Powell handcuffed Plaintiff's left hand. (Doc. 53-2, Police Report at 3). At some point during the officers' interaction with Plaintiff, Officer Crawford arrived at the scene; however, Officer Crawford "was the last to arrive on the scene" and he "witnessed very little of the interaction between [his] fellow police officers and Mr. Calvert" but he "did witness Mr. Calvert defy officer commands." (Doc. 53-10, Crawford Dec. ¶¶ 4–6).

After Plaintiff was handcuffed, he was transported back to Trinity to receive treatment for the left upper arm injury he sustained from being bitten by Bono. (Doc. 53-2, Police Report at 3, 4, 5–6).[7] Plaintiff suffered "total maceration of the biceps tendon[,]" and would require surgery to repair the damage. (*See* Doc. 53-1, Pl. Medical Records).

While Plaintiff was awaiting transport to get medical treatment, Officer Cook returned to Trinity to speak with hospital staff. (Doc. 53-5, Cook Dec. ¶ 17). It was at that time that Officer Cook first learned that Plaintiff was on a mental health or physician hold rather than a police hold. (*Id.*).[8] Further, a nurse at Trinity, Connie Blackburn, informed Officer Cook that:

> Mr. Calvert had been brought to the hospital by his girlfriend due to Mr. Calvert being off his medications. Ms. Blackburn stated Mr. Calvert slept most of the time he was there but when he woke up he became highly agitated and aggressive toward nursing staff and security, throwing things around the ER, causing the hospital to go into lockdown, and eventually attempting to leave the hospital. She stated security attempted to prevent Mr. Calvert from leaving but Mr. Calvert refused to comply, and attempted to punch security, causing a security officer's portable radio to be knocked across the floor. Mr. Calvert then left the building and that is when the hospital called the police.

---

[7] Plaintiff was initially transported back to Trinity to receive treatment for the bite wound but he was eventually transferred to the University of Pittsburgh Medical Center ("UPMC") Montefiore for further treatment. (*See* Doc. 53-2, Police Report at 6).

[8] Officer Cook described a "physician hold" to mean that "a physician had issued an order that [an individual] was not permitted to leave the hospital due to a present mental ailment." (Doc. 53-5, Cook Dec. ¶ 5).

(*Id.*).  After speaking with Nurse Blackburn, Officer Cook spoke with three hospital security guards: Reshawn Kaufman, Fred Merino, and Mark Thompson.  (*Id.* ¶ 18).  The security guards told Officer Cook that "Mr. Calvert was highly agitated and attempted to leave the hospital and they attempted to prevent him . . . [but] Mr. Calvert did not attempt to punch them but did pull away from them and attempt to get around them."  (*Id.*).  Mr. Kaufman allowed Officer Cook to review video of the incident between the guards and Mr. Calvert; the video showed "Mr. Calvert attempting to leave and security attempting to restrain him.  You can see Mr. Calvert pull away from security officers to escape their grasp on three occasions, one of which a security officer's portable radio falls to the floor."  (*Id.* ¶ 19).

Ultimately, Plaintiff was convicted of disorderly conduct, in violation of Section 509.03A E2 of the Codified Ordinance of the City of Steubenville.  (*See* Doc. 53-7, May 14, 2018 State Ct. Ord.).[9]

## B.    Officer Cook and Bono's Training

Submitted simultaneously with Defendants' Memorandum in Support for their Motion for Summary Judgment were logs detailing Officer Cook's training to handle a police dog, as well as Bono's training log.   (*See generally* Doc. 53-8, Bono Training Long; Doc. 53-9, Summary of Cook's K-9 Handler Qualifications).  Further, relevant to his and Bono's training, Officer Cook submits:

21.  K-9 Bono joined the Steubenville police department in December, 2014.

22.  All of the information contained in K-9 Bono's training summaries is true and accurate.

---

[9] Defendants assert that Plaintiff was originally arrested for and charged with Obstructing Police Business for his failure to comply with officers' commands. (*See* Doc. 53, Memo in Supp. of MSJ at 14). Defendants, however, have failed to draw the Court's attention to evidence to support that assertion, instead Defendants cite to Municipal Court's Order adjudicating Mr. Calvert guilty of Disorderly Conduct. (*See id.* at 14 n.52). And while the Municipal Court's Order notes that Mr. Calvert "entered a change of plea to NO CONTEST to an amended charge[,]" the Order does not specify the initial charge. (Doc. 53-7, May 14, 2018 State Ct. Ord.).

23. In December 2014, K-9 Bono completed seventeen hours of training.

24. In 2015, K-9- Bono completed 273.25 hours of training.

25. In 2016, K-9 Bono completed 233.75 hours of training.

26. In 2017, K-9 Bono completed 244.5 hours of training.

27. In January 2018, K-9 Bono completed 33 hours of training.

28. Among many things, K-9 Bono's training included training on searching for and apprehending suspects.

29. On November 26, 2014, myself and K-9 Bono completed 200 hours of the Basic Dual Purpose Patrol and Narcotics Handlers Course including Tracking and Searching Evidence.

30. On November 26, 2014, November 11, 2015; October 26, 2016; September 13, 2017; and September 26, 2018, myself and K-9 Bono completed and were re-certified in the patrol Related Canine Evaluation for Criminal Apprehension, Canine Control and Canine Searches; and Tracking, Article Search, Marijuana, cocaine, Heroin, Methamphetamines and their derivatives.

31. I have also completed twenty-four (24) hours of continuing education by completing Instruction in Frans Koster's Learning Decoying by Doing Seminar; sixteen (16) hours of continuing education in Law Enforcement K-9 Operations; and twenty (20) hours of continuing education by completing First Line Supervision: Mastering Leadership Skills.

(Doc. 53-5, Cook Dec. ¶¶ 21–31) (sic throughout).

## C.    Police Department Policy

William McCafferty, Chief of the Steubenville Police Department, reviewed the Police

Report, which detailed Mr. Calvert's January 10, 2018 interaction with police.  (*See* Doc. 53-11,

McCafferty Dec. ¶¶ 2–3).   He acknowledged that Officers Cook, Powell, Bickerstaff, and

Crawford were all involved the incident.  (*Id.* ¶ 3).  Chief McCafferty submits:

4. After reviewing the facts contained in the Officer Report and the Use of Force Report I concluded the actions of the officers were consistent with policy.

5.  On January 20, 2018, I signed the Use of Force Report with a Spillman reference number wherein I indicated my conclusion that the actions of the officers involved were consistent with policy.

6.  My Spillman reference number is 122.

(*Id.* ¶¶ 4–6; *see also* Doc. 53-2, Police Report at 16).

### D.    Procedural History

Plaintiff commenced this action on January 3, 2019, with the filing of a three-count Complaint alleging: 1) excessive force under 42 U.S.C. § 1983; 2) assault and battery under Ohio law; and 3) municipal and supervisory liability under *Monell*.  (*See generally* Doc. 1, Compl.). On August 22, 2019, Defendants jointly moved for summary judgment on all Plaintiff's claims. (*See generally* Doc. 52, MSJ; *see also* Doc. 53, Memo in Supp. of MSJ).  Plaintiff filed a response in opposition.  (*See generally* Doc. 57, Opp'n to MSJ).  Defendants replied.  (*See generally* Doc. 59, Reply).  As such, this matter is fully briefed and ripe for review.

## II.    STANDARD OF REVIEW

Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 716–17 (6th Cir. 2012).  The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment.  *Id.* at 249–50.

The party seeking summary judgment shoulders the initial burden of presenting the Court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317. 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury").

In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). But self-serving affidavits alone are not enough to create an issue of fact sufficient to survive summary judgment. *Johnson v. Washington Cty. Career Ctr.*, 982 F. Supp. 2d 779, 788 (S.D. Ohio 2013) (Marbley, J.). "The mere existence of a scintilla of evidence to support [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Anderson*, 477 U.S. at 251.

## III.   DISCUSSION

Plaintiff has three pending claims: 1) excessive force, in violation of 42 U.S.C. § 1983; 2) state law assault and battery; and 3) a *Monell* violation. Defendants have moved for summary judgment on all these claims and have raised the defense of qualified immunity. Typically, when the defendant moves for summary judgment, the Court takes the plaintiff's version of the facts as

true.  Here, however, Plaintiff has failed to direct the Court to any record evidence and has merely summarily opposed Defendants' motion.  (*See generally* Doc. 57, Opp'n to MSJ).[10]  As such, the Court shall construe the facts as Defendants present them to be unrebutted.

## A.    Excessive Force

To succeed on a § 1983 excessive force claim, a plaintiff must prove: "(1) the deprivation of a right secured by the Constitution or the laws of the United States; (2) caused by a person acting under the color of state law." *Winkler v. Madison Cty.*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 736 (6th Cir. 2015) (quoting *Jones v. Muskegon Cty.*, 625 F.3d 935, 941 (6th Cir. 2010))) (internal quotations omitted).

The Defendant Officers have raised the defense of qualified immunity.  (*See* Doc. 53, Memo in Supp. of MSJ at 28–30).  "Immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Arrington-Bey*, 858 F.3d at 993 (quoting *White v. Pauley*, 137 S. Ct. 548, 551 (2017) (quotation omitted)).  Thus, the "dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  In § 1983 cases, "qualified immunity prevents government officials from being held liable if (1) the officers did not violate any constitutional guarantees or (2) the guarantee, even if violated, was not 'clearly established' at the time of the alleged misconduct."  *Arrington-Bey*, 858 F.3d at 992 (citing *Pearson v. Callahan*, 555 U.S. at 223, 232 (2009)).  To demonstrate that the guarantee was "clearly established" at the time of the alleged misconduct, "a plaintiff must identify a case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires." *Id.* at 993 (quoting *White*,

---

[10] The Court notes that, in his opposition, Plaintiff submits: "Plaintiff will provide witnesses who are actually the hospital security staff, which they will testify that Petitioner did not fight with them nor did he argue with the nursing staff."  (Doc. 57, Opp'n to MSJ at 4) [sic throughout].  However, had Plaintiff wished to present such evidence for the Court's consideration, the appropriate time do so was when he filed his brief in opposition.

137 S. Ct. at 552). Further, a court has "discretion in deciding which of these two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236 (2009).

Plaintiff alleges that Defendant Officers violated his Fourth Amendment right to be free from excessive force and his Forth Amendment right to be free from unlawful seizures.

### 1. Constitutional Violation Inquiry—Use of Force[11]

In evaluating a police officer's use of force, courts consider: 1) the severity of the crime; 2) the suspect's immediate threat to the safety of the officers and others; and 3) the suspect's evasion or resistance of arrest. *Graham*, 490 U.S. at 396. A court must then determine "whether the totality of the circumstances justified a particular sort of seizure." *Stanfield*, 727 F. App'x at 846 (quoting *Graham*, 555 U.S. at 396) (internal quotations omitted). "Other relevant factors to consider are the duration of the action, the possibility that the person subject to the police action are themselves violent or dangerous, the number of persons with whom the police officers must contend at the same time, and whether the action took place in the context of an arrest." *Hightower v. City of Columbus*, No. 2:12-cv-437, 2013 WL 5963215, at *7 (S.D. Ohio Nov. 7, 2013) (citing *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997)). "The standard 'contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case.'" *Wysong v. City of Heath*, 260 F. App'x 848, 854 (6th Cir. 2008) (quoting *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002)).

---

[11] The Court notes that Plaintiff has failed to allege specific acts against specific Defendants. Precedent is clear that each defendant can only be held liable for his own actions. *See Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (citing *Dorsey v. Barber*, 517 F.3d 389, 399 n. 4 (6th Cir. 2008) (citing *Ghandi v. Police Dep't of the City of Detroit*, 747 F.2d 338, 352 (6th Cir. 1984))). And "[a]s a general rule, mere presence at the scene . . . without a showing of direct responsibility for the action, will not subject an officer to liability." *Ghandi*, 747 F.2d at 352 (internal citations omitted). A review of the facts demonstrates that the canine's handler was Officer Cook. As such, the Court shall construe Plaintiff's excessive force claim for the deployment of the police canine solely against Officer Cook.

This matter is before the Court on Defendants' Motion for Summary Judgment; however, as noted *supra*, in Plaintiff's opposition, he merely summarily opposes Defendants' motion and does not cite to, or otherwise draw the Court's attention to, record evidence in his opposition. Thus, the Court construes the facts as presented in Defendants' motion to be unrebutted. As such, the Court shall view these unrebutted facts in a light most favorable to Plaintiff; then, because this case involves qualified immunity, the Court shall view the facts as a reasonable officer on the scene would. *See Stanfield*, 727 F. App'x at 845–46.

### a. Severity of the Crime

The first factor weighs in favor of Officer Cook. Here, law enforcement began to search for Plaintiff after responding to a call from Trinity about a patient, who was on a hold, that left the hospital after getting into a fight with hospital security. (Doc. 53-2, Police Report at 1, 5; *see also* Doc. 53-5, Cook Dec. ¶ 3–4). The responding officer, Officer Cook, believed: 1) that the patient was on a police hold; and 2) that the fight the patient had with security was a physical altercation. (Doc. 53-5, Cook Dec. ¶¶ 4–5). A "police hold" denotes that a patient has "been arrested for a criminal offense, was receiving medical treatment, and was not permitted to leave the hospital." (Doc. 53-5, Cook Dec. ¶ 5).

Defendants' briefing on the "severity of the crime" is unclear. At times, it appears that Defendants concede that the crimes that Plaintiff engaged in were minor as Plaintiff was ultimately convicted of a minor offense for his actions on January 10, 2018. (Doc. 53, Memo in Supp. of MSJ at 14–15). Yet, Defendants also, though summarily, point out that Officer Cook reasonably,

though incorrectly, believed that Plaintiff: 1) escaped from Trinity while on a police hold;[12] and 2) assaulted the hospital security guards.[13]  (*Id.* at 15).

The Court is required to look at the facts as a reasonable officer on the scene would and cannot use the benefit of 20/20 hindsight.  As such, the Court concludes that a reasonable officer on the scene would have reason that Plaintiff had been involved in an assault or escape.  Plaintiff's argument that Officer Cook "should have questioned the Hospital for more information to see if [Plaintiff] was a violent patient when he came to seek assistance for his mental issues[,]" is unpersuasive.  (Doc. 57, Opp'n to MSJ at 3).  Plaintiff has failed to draw the Court's attention to precedent that would require an officer to do so.

While the Court acknowledges that Plaintiff was ultimately convicted of a minor crime—disorderly conduct[14]—at the time Officer Cook first encountered Plaintiff, he reasonably believed that Mr. Calvert had engaged in the significantly more serious crimes of assault and/or escape.  As such, the Court finds that a reasonable officer, after receiving a call from a hospital that a patient

---

[12] Section 2921.34(A)(1) states:

> No person, knowing the person is under detention, other than supervised release detention, or being reckless in that regard, shall purposefully break or attempt to break the detention, or purposely fail to return to detention, either following temporary leave granted for a specific purpose or limited period, or at the time required when serving a sentence in intermittent confinement.

Ohio Rev. Code § 2921.34(A)(1); *see also* Ohio Rev. Code § 2921.34(C)(2)(a)–(c) (describing when escape is classified as a felony under Ohio law); *compare with* Ohio Rev. Code § 2921.34(C)(2)(d) (describing when the offense is a misdemeanor).

[13] Section 2903.13 of the Ohio Revised Code states the elements for criminal assault in Ohio:

> (A)  No person shall knowingly cause or attempt to cause physical harm to another or to another's unborn.
>
> (B)  No person shall recklessly cause serious physical harm to another or to another's unborn.
> (C)  (1) Whoever violates this section is guilty of assault, and the court shall sentence the offender as provide [in the subsections below].

 Ohio Rev. Code § 2903.13(A)–(C)(1).
[14] *See Goodwin v. City of Painesville*, 781 F. App'x 314, 322 (6th Cir. 2015) (finding that "[a] jury could conclude that disorderly conduct is not a 'serious' crime when determining whether an officer used excessive force in effecting the arrest for that crime." (citations omitted)).

who was "on a hold" and that had left the hospital after fighting with security, would conclude that that individual had committed a serious crime, e.g., assault and/or escape.

### b. Threat to Others

The Court's sister district court has noted that "[t]he most important *Graham* factor is whether a suspect posed an immediate threat to the safety of the officers or others." *Cook v. Kata*, No. 4:14-cv-1283, 2015 WL 6964590, at *6 (N.D. Ohio Nov. 10, 2015) (quoting *Bustamante v. Gonzalez*, No. CV 07-940, 2010 WL 396361, at *7 (D. Ariz. Jan. 29, 2010) (citing *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003))). This factor also weighs in Officer Cook's favor.

While Officer Cook was *en route* to the scene from Trinity Hospital, he received radio correspondence from Officer Bickerstaff that Plaintiff was failing to comply with police commands and that Plaintiff was telling Officer Bickerstaff that police would need to shoot him (Plaintiff). (Doc. 53-5, Cook Dec. ¶ 7). When Officer Cook arrived at the scene, he observed Plaintiff running away from his fellow officers and toward an elderly care facility. (*Id.* ¶ 8). Furthermore, when Officer Cook approached Plaintiff with Bono, after Officer Cook issued several orders that Plaintiff stand down and repeatedly warned Plaintiff that his failure to comply with such orders would result in Bono being deployed and Plaintiff being bitten, Plaintiff turned towards Officer Cook, bladed his body in a "fighting stance," raised his fists, and told Officer Cook "to go ahead and send the dog as he [Plaintiff] was ready." (Doc. 53-5, Cook Dec. ¶¶ 9–13). Further, Officer Cook stated:

> I determined the [Plaintiff] was not going to comply with officers without there being a physical altercation. I concluded the suspect was a danger to himself and others due to his statement that police would have to shoot him. I concluded [that] any physical altercation would likely lead to a struggle for an officer's weapon. Due to these facts, the [Plaintiff's] highly aggressive body language and tone of voice, and his chosen escape path leading directly toward a residential facility for the elderly, I determined the safest means to control the situation was to apprehend the [Plaintiff] using K-9 Bono.

(*Id.* ¶ 15).

Mr. Calvert submits that "he did not illustrate a clear threat to himself, officers and others." (Doc. 57, Opp'n to MSJ at 1). Further, Mr. Calvert maintains that he "did not have weapon to threaten anyone including the officers in this case[,]" and if he "took a fighting stance and ball[ed] both of his hands to show that he wanted to fight, then yes it would be a threat but he did not do so." (*Id.*). Mr. Calvert also submits that "what these officers consider a fighting stance, it could have been something else that these officers misinterpreted as a fighting stance." (*Id.*). As such, Mr. Calvert concludes, he did not threaten anyone. (*Id.*).

Here, Mr. Calvert failed to comply with multiple police orders and was shouting and cursing at police to release the dog. (*See* Doc. 53-6, Bickerstaff Dec. ¶¶ 10, 13; Doc. 53-5 Cook Dec. ¶¶ 10, 13–14; Doc. 53-4, Powell Dec. ¶ 9; *see also* Ex. D., Cook Dashcam at 18:55:51– 18:56:08); *see Horn v. City of Covington*, No. 14-73, 2019 WL 2344773, at 13 (E.D. Ky. June 3, 2019) (stating that the plaintiff's "disobeying police orders and cursing at officers" bolstered officers' assertion that plaintiff was a threat to others.). Mr. Calvert ran towards an elderly care facility. (Doc. 53-5, Cook Dec. ¶ 8). Officers Cook, Powell, and Bickerstaff all submit that Mr. Calvert bladed his body towards Officer Cook and raised his hands, in what the officers describe as a "fighting stance" and challenged Officer Cook to release the dog, (*see* Doc. 53-5 Cook Dec. ¶¶ 11–12; Doc. 53-4, Powell Dec. ¶¶ 10–12; Doc. 53-6, Bickerstaff Dec. ¶¶ 13–15); and while Mr. Calvert disputes this, he fails to cite record evidence in support of his assertion. Thus, based on the foregoing facts, the Court finds that a reasonable officer would conclude that Plaintiff posed a threat to others.

### c. Resisting or Evading Arrest

When analyzing the level of force officers use to effectuate an arrest, courts draw a distinction between active and passive resistance. *See Jackson v. Washtenaw Cty.*, 678 F. App'x 302, 306 (6th Cir. 2017) (the Sixth Circuit "has long distinguished active resistance by arrestees from passive resistance. The former can be characterized by physical force, a show of force, or verbal hostility coupled with failure to comply with police orders. The latter is generally shown by the lack of physical resistance or verbal antagonism.") (internal citations omitted). Generally, active resistance by a suspect will warrant an increase in the use of force, whereas passive resistance does not justify an increase in the use of force. *See Ebie v. City of Pataskala Div. of Police*, No. 2:16-cv-283, 2018 WL 3057722, at *10 (S.D. Ohio June 20, 2018) (Watson, J.) ("failure to comply with officer orders alone does not constitute active resistance[.]").

The third factor also weighs in Officer Cook's favor. As stated previously, Officer Cook received radio correspondence from Officer Bickerstaff that Plaintiff was not complying with police orders and continued to walk away from Officer Bickerstaff. When Officer Cook arrived at the scene he personally witnessed Plaintiff running away from police and towards an elderly care facility. And when Officer Cook warned Plaintiff that his continued failure to comply with police orders would result in the deployment of Bono, Mr. Calvert turned towards Officer Cook, bladed his body, raised his fists in a "fighting stance," and told Officer Cook to release the dog. Based on these facts, the Court concludes that Mr. Calvert engaged in active resistance.

The Court notes that, in his opposition briefing, Mr. Calvert asserts that he did not take a fighting stance. (*See* Doc. 57, Opp'n to MSJ at 1). Plaintiff, however, has failed to direct the Court to record evidence to support such assertion; as such, the Court must disregard it as a self-

serving statement unsupported by the facts. *See Johnson*, 982 F. Supp. 2d at 788. Thus, the third *Graham* factor also weighs in Officer Cook's favor.

### d. Totality of the Circumstances

Having analyzed each of the three *Graham* factors *supra*, the Court's final determination is whether the totality of the circumstances justified Officer Cook's use of Bono to apprehend Plaintiff. The Court finds Officer Cook's actions to be objectively reasonable and justified. The Court has identified all the relevant facts from the time Trinity called the police until Plaintiff was ultimately subdued, and a full recitation is not necessary here. In sum: Officer Cook responded to a call from a fellow officer that a person matching Plaintiff's description had been located near the hospital; Plaintiff was non-compliant with police orders, it was understood that Plaintiff was violent toward hospital security before fleeing the hospital; Plaintiff made statements to the Defendant Officers that led them to believe he posed a danger to himself and/or others; ran away from the Defendant Officers toward a residential facility for the elderly; and Plaintiff took an aggressive stance when confronted by the Defendant Officers. Further, Plaintiff provides no factual support that Officer Cook deployed Bono for any longer than was necessary to apprehend Plaintiff.

Under the totality of the circumstances, Officer Cook's use of Bono to effectuate the arrest of Plaintiff was objectively reasonable. Officer Cook responded to the call from Trinity Hospital about a patient (Plaintiff), who was on hold and then left the hospital after he had fought with security guards. (Doc. 53-5, Cook Dec. ¶¶ 3–4). Officer Cook received radio correspondence from Officer Bickerstaff that he had encountered an individual matching the patient's description on Johnson Road and that he "refused to stop and told Sgt. Bickerstaff he would have to shoot him." (*Id.* ¶ 7). While Officer Cook approached where Plaintiff and Officer Bickerstaff were, he

saw Plaintiff run away from police and towards a residential facility for the elderly. (*Id.* ¶ 8). Officer Cook then exited his vehicle with Bono, and commanded Plaintiff to submit several times; further, Officer Cook warned Plaintiff that his failure to comply with police orders would result in Bono's deployment. Plaintiff ignored every warning and order; and, after the third order from Officer Cook, Plaintiff bladed his body, raised fists, and told Officer Cook to release Bono. (*Id.* ¶¶ 11–12; *see also* Doc. 53-4, Powell Dec. ¶¶ 10–12; Doc. 53-6, Bickerstaff Dec. ¶¶ 13–15). Again, Officer Cook ordered him to comply, yet Plaintiff remained aggressive. (Doc. 53-5, Cook Dec. ¶¶ 13–14). Officer Cook submits that, based on Plaintiff's statement that police would have to shoot him, he determined that if he attempted to physically subdue Plaintiff, Plaintiff would likely attempt to reach for the officer's service weapon. (*Id.* ¶ 15).

After Officer Cook gave the command signal, Bono bit Plaintiff's left upper-arm. (Doc. 53-5, Cook Dec. ¶ 16). And when Bono had subdued Plaintiff, Officer Cook grabbed Bono's collar and told the other officers to get control of Plaintiff's right arm. (*Id.*). When the other officers had handcuffed Plaintiff's right arm, Officer Cook command Bono to release, which he did so immediately. (*Id.*). Furthermore, Officer Cook has submitted training logs for both himself and Bono, which demonstrate that the Officer and the canine were up-to-date in training at the time this incident occurred. (*See generally* Doc. 53-8, Bono Training Long; Doc. 53-9, Summary of Cook's K-9 Handler Qualifications; *see also* Doc. 53-5 Cook Dec. ¶¶ 21–31).

Based on these undisputed facts, the Court concludes that under the totality of the circumstances, Officer Cook did not violate Plaintiff's Fourth Amendment right by using Bono to effectuate the arrest of Plaintiff. Officer Cook's Motion for Summary Judgment on Plaintiff's excessive force claim is therefore **GRANTED**.

####### i.     Officers Powell, Bickerstaff, and Crawford

Plaintiff also appears to assert his excessive force claim against Officers Powell, Bickerstaff, and Crawford.  A review of the facts before this Court, however, demonstrates that these officers were not Bono's handlers, nor is there any colorable argument that any of them independently violated Plaintiff's constitutional rights.  As each defendant can only be held liable for his own actions, *see Ghandi*, 747 F.2d at 352, Officers Powell, Bickerstaff, and Crawford's Motion for Summary Judgment on Plaintiff's excessive force claim is **GRANTED**.

**B.      State Law Assault and Battery Claims**

Generally, under Ohio law, "[i]f an officer uses more force than is necessary to make an arrest and protect himself from injury, he is liable for assault and battery."  *D'Agastino v. City of Warren*, 75 F. App'x 990, 995 (6th Cir. 2003) (ellipsis omitted) (quoting *City of Cincinnati v. Nelson*, No. C-74321, 1975 WL 181750, at *2 (Ohio Ct. App. May 5, 1975)).

Defendants argue that Ohio Revised Code § 2744.03(A)(6) entitles them to immunity. Section 2744.03(A)(6) grants immunity to Ohio public employees "unless their acts or omissions were (1) 'manifestly outside the scope of [their] employment' or (2) done with 'malicious purpose, in bad faith or in a wanton or reckless manner.'"  *Folks v. Petitt*, 676 F. App'x 567, 572 (6th Cir. 2017) (quoting Ohio Rev. Code § 2744.03(A)(6)(a)–(b)).  Generally, "this state law claim rises or falls with [the] federal excessive force claim."  *Bard v. Brown Cty., Ohio*, No. 1:15-cv-643, 2019 WL 590357, at *19 (S.D. Ohio Feb. 13, 2019) (citing *Folks*, 676 F. App'x at 572 ("[E]vidence of 'gratuitous' force for purposes of an excessive force claims is 'sufficient to establish a genuine issue of material facts as to whether [the defendant] acted maliciously or in bad faith in striking and arresting [the plaintiff.]"); *Chappell v. City of Cleveland*, 585 F.3d 901, 916 n.3 (6th Cir. 2009) (finding that plaintiff who could not prove that defendant's use of force

was objectively unreasonable could not prove that defendant acted with bad faith or malicious purpose); *D'Agastino*, 75 F. App'x at 995 (reversing a grant of summary judgment to defendant on an assault and battery claim because the court reversed on a § 1983 claim for excessive force).

Here, the Court found that Defendant Officers did not violate Plaintiff's constitutional right to be free from excessive force when Officer Cook used Bono to effectuate Plaintiff's arrest. *See supra*. As such, Plaintiff's state law assault and battery claims similarly fail. Defendant Officers' Motion for Summary Judgment on Plaintiff's state law assault and battery claims is **GRANTED**.

**C.** *Monell* **Claim**

**1.    Claim against City of Steubenville**

Because this Court has found that Defendant Officers did not violate Plaintiff's constitutional rights by using excessive force, the City of Steubenville cannot be held liable under a municipal liability theory. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) ("If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986))). Therefore, Defendants' Motion for Summary Judgment on Plaintiff's *Monell* claim against the City of Steubenville is **GRANTED**.

**2.    Claim against Chief McCafferty**

Similarly, Chief McCafferty cannot be held liable under a supervisor theory of liability. Sixth Circuit precedent makes clear that "a supervisory official . . . may be held liable only where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable." *Campbell v. City of Springboro, Ohio*, 788 F. Supp. 2d 637, 681 (S.D. Ohio 2011) (quoting *Hays v. Jefferson Cty.,*

*Ky.*, 668 F.2d 869, 874 (6th Cir. 1982)).  Here, Plaintiff has failed to draw the Court's attention to evidence that demonstrates that Chief McCafferty failed to train his subordinates or that such training was reckless.  As such, Chief McCafferty's Motion for Summary Judgment on the *Monell* claim is **GRANTED**.

## IV.    CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment is **GRANTED**. The Clerk is **DIRECTED** to remove Document 52 from the pending motions list and enter judgment in favor of the Defendants.

**IT IS SO ORDERED.**

<u>   */s/ George C. Smith*   </u>
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**